ACCEPTED
06-15-00037-cr
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
12/4/2015 3:16:25 PM
DEBBIE AUTREY
CLERK

NO. 06-15-00037-CR

IN THE

COURT OF APPEALS

OF THE SIXTH JUDICIAL DISTRICT

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
12/4/2015 3:16:25 PM
DEBBIE AUTREY
Clerk

---

THE STATE OF TEXAS,
Appellant

VS.

ERICA LYNN FULLER,
Appellee

---

Appeal in Cause No. 25545

On Appeal from the 6th Judicial District Court
Lamar County, Texas
Honorable Eric Clifford, Judge

---

MOTION FOR REHEARING

---

James R. Rodgers
State License #17136300
Judy Hodgkiss
State License #17136525
100 North Main Street
Paris, Texas 75460
Phone: 903/784-4393
Fax No.: 903/785-0312

ATTORNEYS FOR APPELLEE,
ERICA LYNN FULLER

# NAMES OF ALL PARTIES

The State of Texas
Lamar County & District Attorney's Office
Lamar County Courthouse
119 North Main Street
Paris, Texas 75460

*Appellant*

Jill Drake and Laurie Pollard
Lamar County & District Attorney's Office
Lamar County Courthouse
119 North Main Street
Paris, Texas 75460

*Attorneys for The State of Texas*

Gary D. Young
County and District Attorney
Lamar County Courthouse
119 North Main Street
Paris, Texas 75460

*County and District Attorney*

Jeffrey W. Shell, *Attorney Pro Tem*
Attorney & Counselor at Law
2085 Berkdale Lane
Rockwall, Texas 75087

*Attorney for the State of Texas*

Erica Lynn Fuller
% The Moore Law Firm, L.L.P.
100 North Main Street
Paris, Texas 75460

*Appellee*

James R. Rodgers
Judy Hodgkiss
The Moore Law Firm, L.L.P.
100 North Main Street
Paris, Texas 75460

*Attorneys for Appellee*

# TABLE OF CONTENTS

**PAGE**

Names of All Parties..................................................................... 1

Table of Contents......................................................................... 2

List of Authorities....................................................................... 3

Point of Error............................................................................. 4

Statement of Facts........................................................................ 5

Arguments................................................................................... 13

Prayer for Relief......................................................................... 24

Certificate of Compliance................................................................ 25

Certificate of Service.................................................................... 26

# LIST OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Adames v. State,* 353 S.W.3d 854 (Tex.Crim.App. 2011)............................  21

*Adelman v. State,* 828 S.W.2d 418 (Tex.Crim.App. 1992)..........................  20

*Christensen v. State,* 230 S.W.3d 75 (Tex.App. - Houston [1st Dist.] 2007).  19

*Gold v. State,* 736 S.W.2d 865 (Tex.Crim.App. 1987)...............................  20

*Minter v. State,* 26 Tex.App. 217, 9 S.W. 561.............................................  17

*Rosenbush v. State,* 136 Tex.Crim.. 50 (1938)..........................................  15, 17

*Stewart v. State,* 44 S.W.3d 582 (Tex.Crim.App. 2001)..............................  15

*Tesoro Refining & Marketing Co., LLC v. National Union Fire*.................  18
    *Ins. Co. of Pittsburgh, Pennsylvania,* - F.Supp. 3d - 2015 WL 152943.

*Wirtz v. State,* 361 S.W.3d 694 (Tex.Crim.App. 2012).............................  19

**STATUTES**

*Tex.Cr.Code Ann § 31.03(a)*.................................................................  13

*Tex.Penal Code § 31.01*.......................................................................  13, 20

## NO. 06-15-00037-CR

## IN THE COURT OF APPEALS

## OF THE SIXTH JUDICIAL DISTRICT

---

### THE STATE OF TEXAS,
Appellant

### VS.

### ERICA LYNN FULLER,
Appellee

---

**TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:**

Comes now Erica Lynn Fuller, appellee in the above-entitled and numbered cause, and submits this motion for rehearing pursuant to Rule 49.1 of the Texas Rules of Appellate Procedure and requests that the Court reconsider its opinion of November 20, 2015, and reinstate the judgment of the trial court and/or remand this cause for a new trial.

### POINT OF ERROR

The Court erred in reversing the judgment of the trial court and remanding to the trial court with instructions to enter a judgment of conviction and to proceed with a punishment hearing and sentencing.

## STATEMENT OF FACTS

Erica Fuller, Appellee, was accused of an alleged theft that occurred on December 31, 2010, at Brentwood Nursing Home. Diversicare is the corporation that owned the facility. Ruth Brown (Brown) was the administrator of Brentwood. Melissa Neisler (Neisler) was the business office manager. Erica Fuller's (Fuller) duties included overseeing the account that Brentwood set up, referred to as the "trust fund," and sending invoices into corporate for payment. Fuller had no check writing authority on the account referred to as "operations". Other than making deposits, Fuller had nothing to do with the operations side or operations account. In fact, one person dealt with the residents' trust account (Fuller) and one dealt with the operations account (Neisler).

Angie Whipkey (Whipkey) was the receptionist. She handled money that came into the facility that was either put into the trust fund or the operations fund. She also had the duty of giving the appropriate receipt for the transaction.

The system utilized at Brentwood had a lot of money going through it on a daily basis. Every day there were numerous transactions and receipts. For instance, some of the residents' room and board was paid from the trust fund and some of the residents' room and board was paid from the operations account. Often, Brentwood would write itself a check from one account and deposit it into

another account to reimburse itself for room and board on a resident. In these situations, it was not unusual for a check would be written on the trust account and deposited into the operations account. It was admitted that there can be discrepancies in this system. In fact, the Texas Department of Aging and Disability Services conducted an audit and found some deficiencies. However, these were common and the type of deficiencies found had happened before and have happened since this situation.

Testimony during the trial showed that the receptionist, Whipkey, made many errors in her receipting and efforts to keep up with three separate receipt books. In fact, it was acknowledged that almost all of the receipts prepared during this time period by Whipkey were incorrect.

Brown admitted that Whipkey had done "a lot wrong". One of the problems with Whipkey was that she was not always checking whether it was cash or checks being brought in to which a receipt was given. Brown acknowledged that this was a "big deal" in not getting it straight whether cash or check was brought into the facility. In fact, it was shown that Whipkey repeated this error multiple times even in regard to the same resident. Brown acknowledged that the facility never retrieved the checks or followed up with the residents or their families to determine if payments were made by cash or check as part of its investigation in

this matter. The facility based its audit upon Whipkey's word that she had turned everything over properly. Brown acknowledged that the audit was based upon Whipkey even though almost every receipt done by Whipkey was incorrect.

Whipkey testified that the days were often "hectic" with thirty or more people making payments. She also described that she felt there were "lots of distractions."

Whipkey described the system stating that sometimes there were distributions out of the trust fund in which money would be going out but the receipts that she prepared sometimes showed money coming in instead. Whipkey acknowledged that sometimes she got the process reversed.

The trust fund would have multiple transactions that would take place. Residents could withdraw minor amounts for personal needs. Or, in some situations, the facility would write itself a rather large check from the trust fund to reimburse itself for the residents whose room and board were paid for through the trust fund.

All of the cash that came into the facility was receipted by Whipkey. Whipkey would answer the phone, greet families, receipt trust and accounts receivable. Whipkey took care of three receipt books, which looked identical. Whipkey also did the receipting of all of the checks that would come to the front.

The State acknowledged that Whipkey "got the receipts really mixed up in the books." According to Fuller's job description, she was in accounts payable. However, these duties were limited to sending invoices into corporate for payment. Fuller did not have access to the operations side to make the payments. Neisler described it as having two accounts, operations and trust. Brown stated that Fuller did entries on the trust account side and Glenda Neisler (Melissa Neisler's daughter) did entries on the operations side.

Apparently, in January 2011, Brown contacted corporate that the petty cash box did not reconcile. Fuller and Whipkey were suspended pending the investigation because of access to the petty cash box. Brown contacted Caryon Miller (Miller) who was described as "regional financial specialist" for Diversicare. Miller conducted the audit investigation and Brown deferred to Miller in all respects in regard to the accounting and/or investigation.

Brown acknowledged that she could not place a single dollar having been taken by Erica Fuller but deferred to Miller in that regard.

Miller was not an accountant, certified public accountant, or auditor. Miller had no accounting background except for a few classes. Miller acknowledged that Fuller had nothing to do with the accounts receivable or the operations side other than sending invoices in for payment.

Miller testified that if a resident's family put money into his/her trust fund that was to be used for the resident's room and board. That money would be deposited into the trust fund and then a check would be written to Brentwood from the trust fund that would then be put into Brentwood's operations fund. Through a disbursement sheet, you would log each resident's name and the amount that was to applied to the operations side. Therefore, there was not a specific sheet written for a specific resident but rather an accumulation of many residents and one check being written. The disbursement sheet would tell the operations side each individual and the amount applied to that individual's room and board account. Then there would be a trust fund entry for each resident that would show any deposit or withdrawal. Therefore, there would be money coming in and out of the trust fund. Some of it would be earmarked for room and board to be paid to the operations side. At the same time, money would be coming in on the operations side for various residents that would be used to pay room and board but it would be only from the operations side. If it came in from the trust fund side, a check would be written and signed by someone other than Fuller, and the money would be put into the operations side.

Miller, while conducting the audit, looked at the account of Thomas Hughes. Mr. Hughes' bill for room and board averaged $3,500.00 per month. His

bill was paid by direct deposit from Medicaid into the operations side. Glenda Neisler would have handled the computer entries of Thomas Hughes' Medicaid payments on the operations side. However, Mr. Hughes received a social security disability payment that was deposited into the trust fund. Apparently there was a payment (disbursement sheet) made from the trust fund to the operations side and included $8,000.00 being paid on behalf of Thomas Hughes. In short, $8,000.00 was paid to the operations side as room and board from Mr Hughes and he did not owe $8,000.00 to the facility. The facility had the money in the operations account.

Miller acknowledged that it was Brentwood that had the excess payment from the trust fund to the operations fund. These funds were in the operations account of Brentwood, an account Fuller could make deposits into but not withdraw or write checks. Glenda Neisler would have entered this transaction on the operations side. Miller acknowledged that there can be accounting errors in this system.

Miller acknowledged that there was no law enforcement forensic accounting of this situation performed. Additionally, Diversicare did not bring in a certified public accountant nor auditor to perform this audit. The bottom line is that Brentwood got some money out of the trust fund and it was put into Brentwood's

operation account. The facility had all the money and Fuller did not receive any, and by depositing the funds into the operations account, she could not because she had no access and could not write checks on that account. Miller acknowledged that absolutely no money went into Fuller's possession as all of it was deposited into Brentwood's account.

Miller acknowledged that she did not find a single check nor any cash that ended up in Erica Fuller's possession. Brentwood, when it discovered that the check of $8,000.00 was moved from the trust fund and deposited onto Mr. Hughes' room and board on the operations side simply corrected this with an accounting correction and redeposited the funds back into the trust account. In short, the money went from the trust fund to the operations account and from the operations account back to the trust account. Brentwood was simply correcting an accounting error, not criminal conduct.

Miller, upon whom the entire audit depends, admitted the audit was based upon her belief and assumption that Whipkey's receipts were correct. For instance, Miller assumed that patient Lawler always paid cash even though Whipkey's receipts were written such that it indicated both cash and check. Nevertheless, Miller believed that Lawler's account was really paid with cash because, according to Miller, the Lawler account was always paid with cash.

When confronted with Defendants's Exhibit 10, which is a check for Lawler in the exact amount of the receipt, Miller testified that she was in fact wrong about her initial belief.

Even further when questioned about her lack of experience in conducting an audit, Miller testified that she did not have the experience to make this kind of audit, and that she missed basic things, such as basing the audit on cash, when in fact the records contained checks.

When Miller was questioned about the end result of the questioned transaction, she admitted that the funds were not going to Fuller, but were in Brentwood's operating account the entire time. In addition, she testified that she never found a single check that Fuller took, or that was stamped "for deposit only" to Fuller.

Fuller was fired by Diversicare. Fuller then filed for unemployment benefits and a contested hearing was held before the Texas Employment Commission who determined that "no misconduct established". Thereafter, Fuller filed a suit that was transferred to federal court, where she subjected herself to full discovery. Diversicare did not file any compulsory counter-claim against Fuller. Diversicare settled with Fuller for a total payment of $16,000.00.

The State argues that Brentwood did not have any problems with their trust

funds subsequent to the firing of Fuller. However, substantial changes were made to the system subsequent to these events. Specifically, Brentwood changed its receipting system, and the posting side of the system. Further, procedures were initiated to take care of the problems Whipkey had as receptionist. Now under the system that is used, when there is a receipt given, it can be determined from whom and by whom and the manner of payment.

## ARGUMENT

The State would have the Court believe that because Fuller was able to move funds, and accounting errors were eventually found in a system used by numerous employees, Fuller must therefore be guilty of theft. This is quite a leap, and one which the State asks the Court to take without sufficient evidence. The evidence was legally insufficient to support the jury's verdict.

### Unlawful Appropriation

A person commits theft if he unlawfully appropriates property with the intent to deprive the owner of the property. *Tex.Cr.Code Ann § 31.03(a)*. Appropriate is generally defined as meaning:

(A) to bring about a transfer or purported transfer of title to or other repossessory interest in property, whether to the actor or another; or

(B) acquire or otherwise exercise control over property other than real property. *Tex.Penal Code § 31.01.*

The following conclusively establish facts that make it clear that as a matter of law, the elements of theft simply are not established by any standard, much less beyond a reasonable doubt:

1. Fuller was a bookkeeper for Brentwood and, as such, routinely made deposits and disbursements from the trust account into the operations account;

2. It was not unusual for residents to have deposits into the trust account which were then paid into the operations account of Brentwood;

3. Fuller could make deposits into the operations side but could not perform any other tasks with the operations account. She had no control or access to the funds once deposited into the operations account;

4. Fuller apparently made a disbursement from the facility's trust account into the operations account of Brentwood, and this included funds of a resident named Thomas Hughes;

5. The auditor (Miller) for Brentwood admitted the Thomas Hughes' funds described above were placed into the operations account and were still there when this controversy came about;

6. These funds were not and could not be accessed by Fuller;

7. All of Thomas Hughes' funds in the operations account were returned to the trust account; and

8. The auditor could not find any money that ended up in Fuller's possession.

To constitute theft, there must be some fraudulent taking of the property. *Rosenbush v. State*, 136 Tex.Crim. 50 (1938). Fuller, as part of her normal duties, made disbursements from the trust account to the operations account. It was routine practice and part of her job duties to make such transfers. The complaint in this matter is that Thomas Hughes' money was transferred into Brentwood's operations account. Even if that transfer was in error or mistaken, it is not a crime if Fuller did not have control over those funds after they were deposited into the operations account. Not only did Fuller not exercise any control once the funds were put into the operations account, but she could not. It is inconsistent to accuse one of theft and then argue the artifice of theft was that she put funds in the one place that she had absolutely no way of accessing.

The State and the Court both cite *Stewart v. State*, 44 S.W.3d 582, 588 (Tex.Crim.App. 2001), which states, "the crucial element of theft is the deprivation of property from the rightful owner, without the owner's consent,

regardless of whether the defendant at that moment has taken possession of the property." When the trial court granted the motion for directed verdict, the trial court relied on testimony that the money was in the trust account, transferred into the operations account, and returned to the trust account. The trial court found that Mr. Hughes was not deprived of a single penny, so there could be no theft.

The testimony proved the audit and bookkeeping of Brentwood was flawed. The audit was based on assumptions of cash receipts when in fact they were checks, and records kept by the receptionist Whipkey, which were almost universally done incorrectly. The only thing the auditor clearly established is that the disputed funds never left the facility and were in the operations account under the control of other employees at Brentwood, and not under the control of Fuller. As such, the essential elements of theft not only were not proven beyond a reasonable doubt, but were actually conclusively established otherwise.

Fuller could make deposits into the operations account but had nothing to do with the account thereafter. Numerous residents had money that came into the trust account and was thereafter transferred into the operations account to pay for items such as room and board. Since Fuller's job was to make such transfers she was acting within the scope of her employment. Once the funds went into the operating account, Fuller had no access whatsoever. Only Neisler or a corporate

representative had access to those funds. Hence, the funds were still there after this controversy ensued. In short, there can be no crime of theft when you do not have the possession of the funds or even the hope of having possession of the funds.

Obviously, the transfer of funds as it was being moved into the operations account was noted to be in the name of Thomas Hughes along with many other residents. If Hughes did not need this money to pay his room and board as was represented during the trial, then he clearly would have had a credit in the operations side of Brentwood's books. Fuller would have had no control, no access, and no means of acquiring the money once it went into the operating account. This very act of placing the money in an account to which she had no access shows not only a lack of appropriation but no intent to do so as well. Regardless, Fuller would have had no control and the money was not lost, and if operations did their accounting properly, Hughes would certainly have had a credit and as such, Hughes did not and could not have lost the money, as the trial court recognized before making its judgement.

The State discounts the reasoning in *Rosenbush v. State*, 136 Tex.Crim. 50 (1938), citing *Minter v. State,* 26 Tex.App. 217, 9 S.W. 561, which contained the following reasoning:

"To constitute theft there must be a fraudulent taking of the property and while there may be a taking of the property without actual manual possession of it, still the property must in some manner have come into the possession of the party accused of the theft, either actually or constructively, or he cannot be said to have taken it..."

In *Tesoro Refining & Marketing Co., LLC v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania,* - F.Supp. 3d - 2015 WL 152943., Tesoro was suing its insurance company for employee theft. Tesoro, an oil refiner, was selling oil to Emmex, an oil distributor. Ennex's debt to Tesoro continued to grow. Tesoro's credit manager, however, manipulated documents such that it improved. Ennex had millions in a letter of credit. The credit manager forged a security agreement from Ennex to Tesoro. When Tesoro attempted to act on the letter of credit for payment of the debt, it learned that the document was forged by its credit manager. Tesoro made a claim for theft on its insurance policy which was denied. The Court found no theft citing and distinguishing the reasoning of *Stewart* as the credit manager ultimately did not control the fuel. The credit manager's forgeries did not transfer possession or control of the fuel - the fuel was transferred only upon its subsequent sale by Tesoro to Ennex.

Applying this reasoning to the present case, Hughes' money came under the control of Fuller's employer, Brentwood. Fuller may have transferred Hughes' money from the trust account to the operations account but at all times, it remained

under the control of Brentwood. Fuller did not remove it from Brentwood's control. In fact, Fuller had absolutely no control over Hughes' money when it was deposited into Brentwood's operations account. Hughes' money was not depleted or taken by either Fuller or Brentwood but was simply transferred back to the trust account.

Fuller was acting within her scope of authority to transfer Hughes' money from the trust account to the operations account. She had absolutely no ability to take it from the operations account. In fact, none of his funds were ever taken. His money was always at the facility. It had merely been moved from one account to another. At most, it was a clerical error and, at worst, negligent bookkeeping. However, such a mistake or situation does not rise to even arguable criminal conduct. Fuller was simply trying to fix accounting errors.

**Intent to Deprive**

Evidence in a theft prosecution must further show that the accused intended to deprive the owner of the property at the time the property was taken. *Wirtz v. State*, 361 S.W.3d 694 (Tex.Crim.App. 2012). In determining whether the defendant had criminal intent to commit theft, the Court may consider whether the defendant experienced personal gain from the property obtained from the complainants. *Christensen v. State*, 230 S.W.3d 75 (Tex.App. - Houston [1st Dist.]

2007). As previously set forth, Fuller never received any of Hughes' money and could never have received it. Moreover, the intent to deprive must be for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner. *Penal Code § 31.01.* Again, Hughes never lost the enjoyment or use of his property. It never left the Brentwood accounts. It always remained there for his use and benefit. The trial court recognized this fact and relied on it when entering its judgment.

## Sufficiency of the Evidence

The trial court found that the evidence was legally insufficient to support the verdict of the jury. The relevant standard for judging the insufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Adelman v. State,* 828 S.W.2d 418 (Tex.Crim.App. 1992). The evidence is sufficient under this standard only if the State has affirmatively proven each of the essential elements of the evidence. *Gold v. State,* 736 S.W.2d 865 (Tex.Crim.App. 1987).

Under this process, the appellate court recognizes the trier of fact role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence, and on review, the appellate court determines

whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all of the evidence. *Adames v. State,* 353 S.W.3d 854 (Tex.Crim.App. 2011). An appellate court will conduct constitutional review of the sufficiency of the evidence by measuring the evidentiary sufficiency with explicit reference to the substantive elements of the criminal offense as defined by state law. *Adames v. State,* supra. In this situation, there is absolutely no evidence or inference upon which a rational trier of fact could have concluded that there was proof of the essential elements of theft beyond a reasonable doubt. First of all, as shown above, Fuller, in transferring the funds into the operations account essentially put the funds in the one place she had absolutely no control and absolutely no way or hope of ever receiving control of the money. The very fact that the money was put into the operations account negates that there was any intent to commit a theft. Certainly by putting it into the operations account, both elements of intent and appropriation are not established beyond a reasonable doubt.

Secondly, there was no forensic accounting performed by law enforcement, and no audit by a trained auditor. The State's entire case rests upon the audit of Miller who was neither trained nor educated to perform audits of this type. In fact, Miller admitted that she made assumptions based upon the record keeping of

Whipkey, the receptionist, who made incorrect entries on almost every receipt that was made during this time period. Miller made assumptions that payments were made in cash when that was absolutely demonstrated not to be the case. Miller testified as follows:

Q. You don't have the experience to make an audit like this, do you, because you missed the most basic thing. You based your whole audit that that is cash, cash, and right there in your own records is a check.

A. Yes, sir.

Q. You missed it, didn't you? You just flat missed it, didn't you?

A. That is a check from May of 2010.

(RR, Vol. 5, pp. 47 - 48).

Q. Did you find a single check that Erica Fuller ever took and - or maybe made up a stamp: "for deposit only" to Erica Fuller?

A. No, sir.

Q. Did you find anything like that?

A. No.

Q. But you are the auditor, right?

A. Yes.

Q. You can't find one penny that went into her account, can you or name or **anything else**. Right?

A.  I never reviewed her accounts, no.

(RR, Vol. 5, p. 127).

The testimony shows the audit to be so suspect that no rational trier of fact could have based any inference of guilt on the above.

Miller, the "financial specialist" for Brentwood, clearly establishes that the funds never left the facility and that Fuller had absolutely no control over the funds in the operations account.  As such, as a matter of law, no rational trier of fact could have concluded that there was evidence beyond a reasonable doubt.

## Conclusion

If the State's case proved anything, it was that Brentwood had a deeply flawed, inefficient, and confusing accounting system.  This is the only conclusion a rational trier of fact could reach based on the State's evidence.  In fact, Caryon Miller, brought in to conduct an audit, and Angie Whipkey, the receptionist responsible for taking cash and checks and keeping up with the receipt books, both admitted the system was flawed and records were consistently incorrect.  Receipts were often labeled incorrectly, and funds were deposited in the trust account when they should have been deposited in the operations account, and vice versa.  The State's case and brief do not explain what Fuller supposedly did with, or how she benefitted from the funds she is accused of stealing.  The State cannot show this

because the funds were in Brentwood's accounts throughout this incident. Fuller is essentially being prosecuted, and made a scapegoat, because she was one of several employees forced to work with a flawed accounting system that, not surprisingly, showed inconsistencies when reviewed by administrators. The trial court recognized the errors, found that there had been no theft, and correctly granted appellee's motion for a directed verdict.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Appellant Erica Lynn Fuller prays that the Court will grant this motion for rehearing, set aside the opinion of November 20, 2015, and reinstate the judgment of the trial court in this case and/or remand this case for a new trial.

Respectfully submitted,

THE MOORE LAW FIRM, L.L.P.

BY: /s/ James R. Rodgers
James R. Rodgers
State License #17136300
100 North Main Street
Paris, Texas 75460-4222
Telephone 903/784-4393
Facsimile 903/783-0042
Email: jrodgers@moorefirm.com
ATTORNEY FOR APPELLEE,
ERICA LYNN FULLER

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, the Brief of Appellee was a computer-generated document and contains 4,474 words, not including the Appendix, if any. The undersigned attorney certifies that he relied on the word count of the computer program, which was used to prepare this document.

/s/ James R. Rodgers
James R. Rodgers

## CERTIFICATE OF SERVICE

I certify that a true copy of the above document was delivered to all attorneys

of record/parties, in accordance with the Texas Rules of Appellate Procedure this 4th

day of December, 2015.

/s/ James R. Rodgers
James R. Rodgers